## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WBM MEDICAL ASSOCIATES, LLC, *a New Jersey limited liability company*, ATLANTIC PLASTIC SURGERY ASSOCIATES, P.A., *a New Hampshire professional corporation*, SERENITY INTEGRATED MEDICAL SPA, P.C., *a North Carolina professional corporation*, OSAFO HEALTH CARE CLINIC, INC., *an Illinois corporation*, SENSUAL AESTHETICS, LTD., *a New York corporation*, LAURENE A. GRABILL, D.M.D., P.C., *a Pennsylvania professional corporation*, ETERNAL BEAUTY SKIN AND LASER, INC., *a California corporation*, COSMETIC DERMATOLOGY CENTER, PLC, *a Virginia limited liability company*, JS-BELL ENTERPRISES, LLC, *a South Carolina limited liability company*, JOSEPH LABRICCIOSA, D.O., P.C., *a Pennsylvania professional corporation*, ROCHESTER FAMILY CARE, P.L.C., *a Michigan limited liability company*, LEWIS WYATT, JR., M.D., INC., *a California corporation*, JADYN WEALTH PROPERTIES, LLC, *a Texas limited liability company*, SCULPT VIRGINIA BEACH, LLC, *a Virginia limited liability company*, HELENDALE DERMATOLOGY & MEDICAL SPA, PLLC, *a New York professional limited liability company*, and INFINITY MEDSPA+WELLNESS, PLLC, *a North Carolina professional limited liability company*, | Case No. **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| CYNOSURE, INC., *a Delaware corporation*, | |
| Defendant. | |

## COMPLAINT

## TABLE OF CONTENTS

I.    NATURE OF THE CASE ...............................................................................1

II.   PARTIES ......................................................................................................3

III.  JURISDICTION AND VENUE ...................................................................9

IV.   FACTUAL BACKGROUND .......................................................................9

  A.   The noninvasive body-contouring market is a lucrative place for medical device manufacturers to compete. ..........................................9

  B.   Cynosure develops SculpSure to compete against other body-contouring machines. ........................................................................11

  C.   Cynosure aggressively markets SculpSure to physicians and practitioners as a superior device requiring only one 25-minute, pain-free treatment to achieve results. .........................................................15

  D.   SculpSure does not work as represented, rendering the product effectively useless for practitioners and physicians. ..........................19

  E.   Cynosure misrepresented SculpSure's attributes to Plaintiffs, which have been damaged because SculpSure is unfit for its intended purpose. .............................22

    1.   WBM Medical Associates, LLC (Virapel) .............................22

    2.   Atlantic Plastic Surgery Center..............................................23

    3.   Serenity Integrated ................................................................24

    4.   Osafo Health Care..................................................................26

    5.   Sensual Aesthetics .................................................................28

    6.   Laurene A. Grabill, D.M.D.....................................................29

    7.   Eternal Beauty Skin and Laser................................................30

    8.   Cosmetic Dermatology Center................................................32

    9.   Touch MedSpa .......................................................................33

    10.  Dr. Joseph LaBricciosa .........................................................34

    11.  Rochester Family Care............................................................35

    12.  Lewis Wyatt, Jr., M.D.............................................................37

13.    Jadyn Wealth Properties, LLC (Oasis Body Sculpting) ............................38

14.    Sculpt Virginia Beach ................................................................................39

15.    Helendale Dermatology & Medical Spa ....................................................40

16.    Infinity MedSpa+Wellness ........................................................................41

V.    CLAIMS ALLEGED .............................................................................................42

VI.    PRAYER FOR RELIEF ........................................................................................46

VII.    JURY DEMAND ....................................................................................................47

Plaintiffs WBM Medical Associates LLC, Atlantic Plastic Surgery Associates, P.A., Serenity Integrated Medical Spa, P.C., Osafo Health Care Clinic, Inc., Sensual Aesthetics, Ltd., Laurene A. Grabill, D.M.D., P.C., Eternal Beauty Skin and Laser, Inc., Cosmetic Dermatology Center, PLC, J-S Bell Enterprises, LLC, Joseph LaBricciosa, D.O., P.C., Rochester Family Care, P.L.C., Lewis Wyatt, Jr., M.D., Inc., Jadyn Wealth Properties, LLC, Sculpt Virginia Beach, LLC, Helendale Dermatology & Medical Spa, PLLC, and Infinity MedSpa+Wellness, PLLC (collectively "Plaintiffs") bring this Complaint against Defendant, Cynosure, Inc.  Plaintiffs allege the following based upon personal knowledge and experience, and as to all other matters upon information and belief, including investigation conducted by its attorneys:

## I.      NATURE OF THE CASE

1.      In 2015, Cynosure, Inc. began selling the SculpSure Non-Invasive Body Contouring Platform ("SculpSure") to physicians, aesthetic surgery practices, and medical spas (or "med spas") across the United States. Cynosure marketed SculpSure as an effective way for medical practices to reduce fat in a patient's midsection through the use of laser technology.

2.      As part of an aggressive campaign to induce Plaintiffs to purchase the almost $200,000 machine, Cynosure made several material misrepresentations regarding certain attributes of the SculpSure device. Cynosure claimed that, *inter alia*: (a) only one, simple 25-minute treatment achieved 24% fat loss; (b) SculpSure is virtually painless and easily tolerated by the patient without pain medication or anesthesia; and (c) the procedure could be performed "hands free" without a physician or trained staff member needing to be present during the majority of the treatment.

3.      But SculpSure seldom achieves results in patients after *multiple* treatments—much less so with just the single procedure Cynosure claimed would suffice. And to even have a

chance at achieving results, operators must turn the power level so high that it causes intolerable pain for the patient, necessitating that the operator remain in the room to monitor patient comfort. In many cases, the operator must stop the procedure altogether.

4.      Not surprisingly, practices failed to achieve the success that Cynosure promised, and instead have found SculpSure detrimental to their business.

5.      By recommending it, practitioners risk good will, encouraging patients to pay thousands of dollars for a procedure they do not believe in themselves. A practice cannot be expected to push SculpSure to clients when the company that built the machine has knowledge that its representations are false.

6.      Performing the treatment also threatens to drain resources while taxing doctors and staff members. As the unsuccessful treatments add up, offices must futilely work with Cynosure to find a solution, deal with complaints from unsatisfied patients, and perform retreatments or alternative procedures free of charge.

7.      Finally, continuing to own the machine jeopardizes these practices' financial health. The device's failures render it incapable of recouping its significant cost—a number that continues to grow with each refund or free retreatment necessarily offered to keep customers happy.

8.      In short, Cynosure has marketed to physicians, aesthetic surgery facilities, and medical spas a costly device that has proved unusable in those very practices.

9.      SculpSure is thus effectively useless for the purpose for which it was intended. The device cannot be used in the way that Cynosure marketed it. Nor can it be used in an otherwise commercially viable manner.

10.     Plaintiffs have been in fact deceived by Cynosure's representations, did not receive the benefit of the bargain, and suffered actual damages.

## II.     PARTIES

11.     WBM Medical Associates, LLC is a New Jersey limited liability company that does business as Virapel at 602 Sheppard Road, Voorhees, New Jersey 08043. Virapel provides hormone therapy, and bought a SculpSure to supplement its practice in December 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Virapel] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Virapel was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

12.     Atlantic Plastic Surgery Associates, P.A. is a New Hampshire professional association operating as Atlantic Plastic Surgery Center at 100 Griffin Road, Suite B, Portsmouth, New Hampshire 03801. Atlantic Plastic Surgery provides cosmetic treatments, plastic surgery, and skin care to its patients, and bought a SculpSure in October 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Atlantic Plastic Surgery] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Atlantic Plastic Surgery was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

13.     Serenity Integrated Medical Spa, P.C. is a North Carolina professional corporation operating at 3115 Boone Trail, Fayetteville, North Carolina 28306. Serenity Integrated provides cosmetic treatments and skin care to its patients, and bought a SculpSure in May 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated

"[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Serenity Integrated] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Serenity Integrated was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

14.     Osafo Health Care Clinic, Inc. is an Illinois corporation operating at 215 Remington Boulevard, Suite G-2, Bolingbrook, Illinois 60640. Osafo Health Care is an internal medicine practice that provides urgent care needs and treatment for various chronic medical conditions. Osafo Health Care bought a SculpSure in May 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Osafo Health Care] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Osafo Health Care was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

15.     Sensual Aesthetics, Ltd. is a New York corporation operating at 200 West 57th Street, Suite 204, New York, New York 10019. Sensual Aesthetics provides cosmetic and medical laser treatments to its patients, and bought a SculpSure in November 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Sensual Aesthetics] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Sensual Aesthetics was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

16.     Laurene A. Grabill, D.M.D., P.C. is a professional corporation operating at 14 Wilmont Mews, West Chester, Pennsylvania 19382. Dr. Grabill and her staff provide dental treatments, cosmetic dentistry services, facial aesthetics, and skin care to their patients. Dr. Grabill bought a SculpSure in June 2017. Her purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Laurene A. Grabill] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Grabill was injured in her property and business by the actions of Defendant as described herein, and suffered actual damages.

17.     Eternal Beauty Skin and Laser, Inc. is a California corporation that formerly operated at 20630 Stevens Creek Boulevard, Cupertino, California 95014. Eternal Beauty provided cosmetic treatments and skin care to its patients, and bought a SculpSure in October 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts.  [Eternal Beauty] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Eternal Beauty was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

18.     Cosmetic Dermatology Center, PLC is a Virginia limited liability company operating at 8377B Greensboro Drive, McLean, Virginia 22102. Cosmetic Dermatology provides cosmetic treatments and skin care to its patients, and bought a SculpSure in March 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Cosmetic Dermatology] agrees to submit all disputes arising out of, or

relating to, this Agreement to a court in Boston." Cosmetic Dermatology was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

19.     JS-Bell Enterprises, LLC is a South Carolina limited liability company doing business as Touch MedSpa, which operates at 702-5 6th Avenue S., Suite #5, North Myrtle Beach, South Carolina 29582. Touch MedSpa provides cosmetic treatments, body contouring, injectables, and skin care to its patients; it bought a SculpSure in January 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Touch MedSpa] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Touch MedSpa was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

20.     Joseph LaBricciosa, D.O., P.C. is a Pennsylvania professional corporation operating at 1999 Sproul Road, Suite 21, Broomall, Pennsylvania 19008. Dr. LaBricciosa's practice focuses on general medicine. He purchased a SculpSure in December 2016. His purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Dr. LaBricciosa] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. LaBricciosa was injured in his property and business by the actions of Defendant as described herein, and suffered actual damages.

21.     Rochester Family Care, P.L.C. is a Michigan limited liability company operating at 940 W Avon Road, Suite 9, Rochester Hills, Michigan 48307. Rochester Family Care focuses on internal medicine and acupuncture, and bought a SculpSure in August 2016. Its purchase

agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Rochester Family Care] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Rochester Family Care was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

22.    Lewis Wyatt, Jr., M.D., Inc. is a California corporation operating at 99 North LaCienaga Boulevard, Suite 306, Los Angeles, California 90211. Dr. Wyatt focuses on obstetrics, gynecology, and hormone therapy, and bought a SculpSure in July 2016 to supplement his practice. His purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts.  [Dr. Wyatt] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Wyatt was injured in his property and business by the actions of Defendant as described herein, and suffered actual damages.

23.    Jadyn Wealth Properties, LLC is a Texas limited liability company operating at 22 Wooded Brook Drive, The Woodlands, Texas 77382. Jadyn Wealth Properties bought a SculpSure in August 2016.  Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Jadyn Wealth Properties] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Jadyn Wealth Properties was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

24.    Sculpt Virginia Beach, LLC is a Virginia limited liability company operating at 2865 Lynnhaven Drive, Suite 3A, Virginia Beach, Virginia 23451. Sculpt Virginia Beach

provides cosmetic treatments and skin care to its patients, and bought a SculpSure in September 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Sculpt Virginia Beach] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Sculpt Virginia Beach was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

25.    Helendale Dermatology & Medical Spa, PLLC is a New York professional limited liability company operating at 500 Helendale Road, Suite 100, Rochester, New York 14609. Helendale Dermatology provides cosmetic treatments and skin care to its patients, and bought a SculpSure in September 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Helendale Dermatology] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Helendale Dermatology was injured in its property and business by the actions of Defendant as described herein, and suffered actual damages.

26.    Infinity MedSpa+Wellness, PLLC is a North Carolina professional limited liability company operating at 2809 Coltsgate Road, Suite 100, Charlotte, North Carolina 28211. Infinity MedSpa provides cosmetic treatments, body contouring, and skin care to its patients, and bought a SculpSure in January 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Infinity MedSpa] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Infinity MedSpa was injured in its property and business by the actions of Defendant as described herein.

27.     Defendant Cynosure is a corporation incorporated and existing under the laws of Delaware with its principal place of business located at 5 W Carlisle Road, Westford, Massachusetts, 01886. Defendant Cynosure has developed and marketed several medical devices and lasers, including SculpSure, which it has sold to medical practitioners internationally.

### III.     JURISDICTION AND VENUE

28.     This Court has diversity jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, and the action lies between citizens of different states.

29.     Venue is proper because the action arises from acts and occurrences within the Commonwealth of Massachusetts, the Defendant Cynosure is headquartered in Westford, Massachusetts, and the parties agreed, via a choice-of-law provision and forum selection clause in their purchase agreements, to submit all disputes to a court in Boston, Massachusetts subject to Massachusetts law.

### IV.     FACTUAL BACKGROUND

**A.     The noninvasive body-contouring market is a lucrative place for medical device manufacturers to compete.**

30.     Noninvasive body-contouring procedures constitute a large and rapidly growing sector of the cosmetic surgery market in the United States, with the number of treatments performed having increased by approximately 7% in 2017 compared to the previous year.[1]

31.     These procedures aim to eliminate stubborn fat from certain areas of the body. Body-contouring, however, differs from liposuction. Liposuction uses suction techniques to surgically extract fat deposits from specific areas of the body. Because liposuction requires anesthesia, it is typically an outpatient procedure at a surgery center, or if large amounts of fat

---

[1] The American Society of Plastic Surgeons, "2017 Cosmetic Plastic Surgery Statistics," at 2, *available at* https://www.plasticsurgery.org/documents/News/Statistics/2017/plastic-surgery-statistics-report-2017.pdf.

are being removed, the procedure will be done in a hospital and may require an overnight stay. Patients typically return to work after several days and to normal activities within two weeks.[2]

32.     Body-contouring, by contrast, uses noninvasive medical devices (*e.g.*, lasers) to eliminate or shrink fat cells without an incision or anesthesia. Practitioners most commonly (and most effectively) employ it to diminish small pockets of stubborn fat and reduce the circumference of a patient's midsection and flanks. These procedures are commonly performed in a physician's office or med spa without anesthesia and are appealing because they do not require any recovery time.[3]

33.     Body-contouring devices began appearing on the market approximately 10 years ago, and several companies have developed different technologies to achieve the desired results.[4]

34.     For example, Zerona uses a low-level laser to target superficial fat cells. The laser does not destroy or kill the fat cells, but disrupts their membranes causing them to release their contents. The end result is that the affected fat cells shrink, causing a reduction in the belly, waist, or body size of the patient. Patients feel no pain. But because the treatment only targets superficial fat cells, it typically takes about six to twelve 40-minute treatments to achieve results.[5]

---

[2] *Liposuction*, MAYO CLINIC (Nov. 29, 2016), http://www.mayoclinic.org/tests-procedures/liposuction/home/ovc-20197272; *How to Choose Between Liposuction and Noninvasive Fat Reduction Procedures*, AM. BD. OF COSMETIC SURGERY BLOG (Aug. 19, 2015), http://www.americanboardcosmeticsurgery.org/liposuction/how-to-choose-between-liposuction-and-noninvasive-fat-reduction-procedures/; *Liposuction*, MEDINCENET, http://www.medicinenet.com/liposuction/page3.htm (last visited June 15, 2018).

[3] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 2; Deborah Kotz, *CoolSculpting and Zerona: Body Sculpting Without Surgery*, US NEWS & WORLD REPORT (Sept. 17, 2010, 1:26 p.m), http://health.usnews.com/health-news/blogs/on-women/2010/09/17/coolsculpting-and-zerona-body-sculpting-without-surgery.

[4] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 2.

[5] *How Does the Zerona Laser Work?*, MYZERONA.COM, http://www.myzerona.com/what-is-zerona.html (last visited June 15, 2018); R. Stephen Mulholland, Malcolm D. Paul, & Charbel Chalfoun, *Noninvasive Body Contouring with Radiofrequency, Ultrasound, Cryoliolysis, and Low-Level Laser Therapy*, 38 CLINIC IN PLASTIC

35.     Another technology, CoolSculpting, uses a process called cryolipolysis to kill fat cells. Because fat cells freeze at higher temperatures than the surrounding tissue, the CoolSculpting device can deliver cold temperatures through the skin to freeze fat cells without damaging the skin. Targeted fat cells eventually die before the body removes them through its natural processes, yielding a reduction in size in the treated area. However, because the machine works by pulling a patient's skin into the device to apply very cold temperatures, patients frequently experience discomfort for the first five to 10 minutes of the procedure. The entire procedure takes about an hour, but unlike the Zerona procedure, CoolSculpting can often take only one visit to achieve results.[6]

**B.     Cynosure develops SculpSure to compete against other body-contouring machines.**

36.     Cynosure, located in Westford, Massachusetts, is a corporation that specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Specifically in the area of noninvasive body-contouring, Cynosure sells a device it calls "SculpSure."[7]

37.     Cynosure developed and manufactured SculpSure from its Westford offices to compete in the noninvasive body-contouring market against Zerona, CoolSculpting, and similar devices. The machine uses a laser to heat adipose tissue (loose connective tissue in which fat

---

SURGERY 503, 514-17 (2011), *available at* http://www.invasix.com/upload/articles/peerrev_clinps_titefxmention.pdf; Kotz, *supra* note 3.

[6] *How It Works*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/how-it-works/ (last visited June 15, 2018); *What To Expect*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/what-to-expect/ (last visited June 15, 2018); *FAQs*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/faqs/ (last visited June 15, 2018); Kotz, *supra* note 3;

[7] *About Cynosure*, CYNOSURE, http://www.cynosure.com/about-cynosure/ (last visited June 15, 2018); *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018).

cells accumulate[8]) to a temperature between 42°C and 47°C. Cynosure claimed this would cause

the targeted fat cells to eventually die before being removed by the body's lymphatic system.[9]

38.    The machine has four long, flexible arms that are part of what Cynosure calls the

"umbilical management system." At the end of each arm is a rectangular applicator.[10] Sample

pictures follow:



39.    During the procedure, the operator arranges several plastic frames onto the

patient's body in the treatment area, applies a lotion to certain areas of the patient's skin within

those frames, and then attaches the rectangular applicators to the frames.[11]



---

[8] *Adipose Tissue*, DICTIONARY.COM, http://www.dictionary.com/browse/adipose-tissue.

[9] *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018).

[10] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 12.

[11] SculpSure Clinical Reference Guide (Rev. 2), at 24-28.

40.    Each applicator used during the procedure consumes one "PAC." PAC's are credits that Cynosure loads onto a PAC Key. Without a sufficiently loaded PAC Key inserted into the USB port on the SculpSure, the machine will not function. Med spas and physicians must therefore purchase PAC Keys from Cynosure in advance before treating patients. As of April 2016, a PAC Key came loaded with 100 PAC's and cost $5,000.[12]

41.    Once the applicators are in place, the operator initiates treatment. Treatment has two phases: "build mode" and "sustain mode." Build mode occurs for the first four minutes of the procedure, during which the machine attempts to "heat[] the fat to the target temperature." Sustain mode lasts the remaining 21 minutes and aims to "maintain[] the target temperature in the fat layer."[13]

42.    The machine can deliver energy in a range of 0.90 to 1.40 Watts per square centimeter (W/cm$^2$), in increments of 0.05 W/cm$^2$. The build mode power density setting defaults to 1.10 W/cm$^2$.



---

[12] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 36; CYNO - Q1 2016 Cynosure Inc Earnings Call, at 3 (Apr. 26, 2016).

[13] SculpSure Clinical Reference Guide (Rev. 2), at 29.

43.     Despite the default setting being set to 1.10 W/cm$^2$, SculpSure directs that the operator start at a low level and increase the power, adjusting the heat based on patient feedback. Initially, Cynosure released the following Zone Adjustment Chart to guide the treatment:[14]

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

(Fat Destruction Zone spans scores 3 and 4.)

44.     When the patient reports "moderate deep warmth and cooling" periods, the operator should maintain that level.[15]

45.     According to Cynosure, at this point, the operator can leave the patient in the room with a "transmitter button to page [the staff]" in the event he or she patient experiences heat or discomfort beyond "moderate deep warmth and cooling." The operator can then return to provide an "Advance-to-Cool" shot for temporary relief to the patient.[16]

46.     At no time during the marketing of SculpSure did Cynosure report that patients would feel pain, have to endure heat to the point of an intense burning sensation, or require any painkiller or anesthesia.

---

[14] SculpSure Clinical Reference Guide (Rev. 2), at 32.

[15] *Id.*

[16] *Id.* at 31-32.

**C.    Cynosure aggressively markets SculpSure to physicians and practitioners as a superior device requiring only one 25-minute, pain-free treatment to achieve results.**

47.    The FDA cleared Cynosure to market its SculpSure device in mid-2015. Cynosure in turn planned to officially launch the product later that year.[17]

48.    By autumn 2015, Cynosure was engaged in a motivated campaign to sell SculpSure to various cosmetic surgery providers, med spas, and practitioners across the country. From its Massachusetts headquarters, the company developed a consistent, uniform message to distinguish SculpSure from its competitors (namely CoolSculpting). Cynosure created videos (both for the practitioners to which it marketed and for use with the practices' prospective clients), brochures, webpages, presentations, and other promotional materials reflecting that consistent message.[18] Cynosure distributed these materials to potential purchasers through its website, marketing department, and sales representatives.

49.    Specifically, Cynosure emphasized three aspects of the device critical to purchasers.

50.    First, Cynosure uniformly represented to potential buyers that patients would achieve "[d]efined success," "[m]aximal performance," or "optimal results" in one, 25-minute treatment. According to Cynosure's website and marketing brochures, just one treatment would eliminate up to 24% body fat in the treated area.[19] Before and after photos showed marked results from just "a single treatment in one anatomical area." And by purportedly achieving these

---

[17] *FDA Clears Expanded Use for Cynosure Lipolysis Device*, MEDICAL PRODUCT OUTSOURCING (Jul. 7, 2015), http://www.mpo-mag.com/contents/view_breaking-news/2015-07-07/fda-clears-expanded-use-for-cynosure-lipolysis-device/.

[18] *See* Cynosure Investor Event (Presentation) (Sep. 15, 2015).

[19] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited Aug. 17, 2017); SculpSure Product Presentation (Nov. 2015), at 8.

end results in only 25 minutes, Cynosure had a straightforward way to distinguish its product

from CoolSculpting:[20]



51.    This efficiency was particularly attractive to buyers. If the procedure truly took 25

minutes, those who owned a SculpSure could perform more treatments in a day without having

to tax their staff, hire more employees, or perform follow-up with the patient. Furthermore, the

minimal time commitment provided practices with a key marketing tool to convince patients to

opt for the procedure, especially when compared to SculpSure's existing competitors.

52.    Second, Cynosure stressed that the procedure would be a comfortable and pain-

free experience for patients, despite the fact that SculpSure utilized very high temperatures to

eliminate the fat cells.

53.    According to Cynosure, SculpSure's "Contact Cooling" system would "assist in

maintaining safe and comfortable skin surface temperatures." At the proper setting, Cynosure

claimed that SculpSure would cause no more than "long[] peaks of moderate deep warmth and

---

[20] SculpSure Product Presentation (Nov. 2015), at 7, 12-44.

cooling."[21] Cynosure's marketing materials assured that "[m]ost patients feel a tingling sensation intermittently which is well tolerated"[22] and "[c]omfortable."[23] To demonstrate the tolerability of the procedure, Cynosure marketing videos showed women casually using cell phones, tablets, or e-readers during the procedure without any visible signs of discomfort and without any staff present in the room to monitor them.[24] Consistent with these representations, Cynosure also held live demonstrations at various promotional events where a model would sit and supposedly receive the treatment while talking to audience members to illustrate how painless the procedure was.

54.     To compare, CoolSculpting's suction mechanism and intense cold meant patients would have to endure at least a few minutes of discomfort during the procedure. So SculpSure offered the promise of attracting those patients who may be more hesitant to body contouring.

55.     Third, Cynosure promoted the device as "hands-free,"[25] including a pager system with the device that would allow staff to "leav[e] the treatment room" but still communicate with patients. In its manual, Cynosure noted that a patient could use the transmitter to request "a magazine or water" during the treatment even though the staff member may not be in the room.[26] And in online promotional videos, Cynosure showed patients being left alone in the treatment room after only a few minutes:[27]

---

[21] SculpSure Clinical Reference Guide (Rev. 2), at 9, 32.

[22] SculpSure Marketing Brochure (2015), at 2.

[23] SculpSure Product Presentation (Nov. 2015), at 8.

[24] *See, e.g.*, DocWeb, *SculpSure – Head to Head Treatment,* YOUTUBE (Jan. 16, 2016) https://www.youtube.com/watch?v=Def18hMKFzI (last visited June 15, 2018).

[25] Cynosure Investor Event (Presentation) (Sep. 15, 2015).

[26] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 35.

[27] DocWeb, *SculpSure – Head to Head Treatment,* YOUTUBE (Jan. 16, 2016), https://www.youtube.com/watch?v=Def18hMKFzI (last visited June 15, 2018).



56.    If staff could leave the room, they could utilize their time more efficiently,

assisting other patients, taking care of paperwork, or even performing a separate procedure.

Potential purchasers naturally found this potential aspect of the device appealing.

57.    All told, Cynosure's efforts to sell the machine promoting these supposed

qualities were successful.[28] Cynosure has sold hundreds of SculpSures since 2015, with

approximately 350 in the vicinities of five cities (Boston, Los Angeles, Miami, Chicago, and

New York City) alone.[29]

---

[28] *See* CYNO - Q1 2016 Cynosure Inc Earnings Call, at 3 (Apr. 26, 2016) ("By virtually every measure
SculpSure continues to exceed our expectation."); CYNO – Q2 2016 Cynosure Inc Earnings Call, at 3 (Jul. 26,
2016) ("Revenue for the quarter increased to a record $110.3 million, 32% higher than the year-over-year period.
The primary contributors to the top-line results were SculpSure, our exciting new hyperthermic laser treatment for
noninvasive fat reduction . . . ."); CYNO – Q3 2016 Cynosure Inc Earnings Call, at 3 (Oct. 25, 2016) ("I will now
update you on SculpSure, which has generated meaningful revenue for the past four full quarters and continues to
outperform our expectations."); CYNO – Q4 2016 Cynosure Inc Earnings Call, at 3 (Feb. 07, 2017) ("SculpSure,
one full year into its launch, remains ahead of our expectations. Q4 set the high watermark for SculpSure placements
in a single quarter.").

[29] *See Patients*, CYNOSURE, http://patients.cynosure.com/ (searching for SculpSure machines located within 100
miles of the following zip codes: 02201, 90001, 33018, 60611, and 10018).

58.     Hologic, Inc., who acquired Defendant for approximately $1.44 billion in early 2017, consistently singled out SculpSure when discussing the basis for the massive acquisition of the company.[30]

**D.     SculpSure does not work as represented, rendering the product effectively useless for practitioners and physicians.**

59.     Nevertheless, Cynosure's representations about SculpSure proved to be false. In short, Cynosure misrepresented SculpSure's capability as a simple, one-and-done treatment without pain.

60.     From the onset, patients failed to achieve results from SculpSure despite being treated as directed using Cynosure's Zone Adjustment Chart. Recognizing the problem, Cynosure subsequently revised its treatment protocol for SculpSure. In mid-2016, Cynosure introduced a "Treat to Complete" treatment plan, advising doctors to manage a patient's "expectations that multiple treatments may be part of the treatment plan."[31] Yet the "Treat to Complete" protocol directly contradicted Cynosure's marketing of SculpSure as a one-time, 25-minute treatment—with the latter message still advertised today on Cynosure's website.[32]

61.     Furthermore, Cynosure directed physicians and practitioners to raise the power levels on the machine to compensate for poor results, contradicting prior claims that any setting between 0.9 and 1.4 $W/cm^2$ would suffice. Cynosure even suggested that once patients appear to have reached the threshold level they can tolerate, the operator should then "bump" the setting higher without the patient's knowledge.

---

[30] HOLX – Hologic Inc to Acquire Cynosure Inc Conference Call, at 4, 6-7, 9 (2017)

[31] SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), at 15.

[32] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018) (claiming that a "single treatment" provided "[d]efined success" with an "[a]verage reduction in fat volume" of "[u]p to 24%.").

62.     But even at lower power levels, many experienced excruciating pain. Practitioners reported that patients would jump off the treatment table, howl in agony, or even demand the operator stop the machine because they could not tolerate the procedure. Such circumstances paint a far different picture than the so-called "tingling sensation[s]" that Cynosure claims are "well-tolerated."[33]

63.     The patient experience also makes it impossible for the operator to leave the treatment room and renders the pager system on the device useless. In practice, the procedure requires practitioners to stay in the room for the entire 25 minutes, and thus Cynosure's promise of a "hand-free" treatment is untrue. Operators constantly need to adjust the device's levels, provide "Advance to Cool" shots, or coach patients through the pain.

64.     Nor can practices simply administer anesthesia to make the procedure more bearable. The treatment requires feedback from patients to determine the appropriate energy level. If patients lack the ability to feel any pain or excessive heat in the treated area, then they cannot provide the necessary response to the doctor to lower the power level on the machine. Moreover, administering anesthesia would render the procedure inappropriate for med spas or other medical offices—the very practices for whom SculpSure was designed and to which it was marketed. And anesthesia, or even a strong oral analgesic, would require time before the procedure to administer it, downtime after the treatment to allow the patient to recover, and a doctor to monitor the patient to make sure he or she was fit to leave, any of which would render the promise of a 25-minute procedure false.

65.     Given patients' painful experiences with the treatment, Cynosure had to update its Zone Score Adjustment Chart on multiple occasions. Initially Cynosure claimed that a power

---

[33] SculpSure Marketing Brochure (2015), at 2.

level correlating with "[t]ingly, short intervals of warmth and cooling" in the patient would result in "fat destruction."  Yet by April 2016, it removed that claim. And but a few months later, Cynosure changed the chart again. This time it maintained that results would require "[p]rickling, pinching, pressure, [and] longer peaks of moderate deep heat and cooling"[34]—an artful, yet still erroneous description of the distress many patients experienced. And the description completely contradicts the one advertised by Cynosure on its website: a "comfortable," "gentle, warming sensation" that "fl[ies] right by."[35]

Rev. 2 (2015)

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

(Fat Destruction Zone spans rows 3 and 4)

Rev. 4 (April 2016)

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. Increase setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

(Fat Destruction Zone at row 4)

Rev. 7 (August 2016)

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. Increase setting. |
| 4 | Prickling, pinching, pressure, longer peaks of moderate deep heat and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

(Fat Destruction Zone at row 4)

---

[34] *Compare* SculpSure Clinical Reference Guide (Rev. 2), *with* SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), *and* SculpSure Clinical Reference Guide (Rev. 7, Nov. 2016).

[35] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited Aug. 17, 2017).

66.    Ultimately, the situation has left practices in an impossible position. They have spent hundreds of thousands of dollars on a machine that does not work as Cynosure represented. At the same time, they lack the ability to recoup that cost; practices cannot continue to recommend a cosmetic procedure to their patients knowing that it is likely to involve several painful treatments, but unlikely to be effective.

**E.    Cynosure misrepresented SculpSure's attributes to Plaintiffs, which have been damaged because SculpSure is unfit for its intended purpose.**

**1.    WBM Medical Associates, LLC (Virapel)**

67.    WBM Medical Associates, which does business under the name "Virapel," provides hormone therapy to its patients from its offices in Voorhees, New Jersey. It is run by William B. Miller, D.O., and Cheryl Felt, MSN, APN-C.

68.    In December 2016, Bob Iero and Joseph Amon of Cynosure visited Virapel to give a presentation on SculpSure. The representatives described SculpSure as a one-time treatment that would reduce body fat by 24%. They also claimed the procedure resulted in little-to-no pain for the patient. In fact, they claimed, the treatment was so painless, the operator could leave the room while the device remained running.

69.    While Dr. Miller believed his practice lacked the patient population to support SculpSure, Iero and Amon reassured Dr. Miller that would not be a problem because Cynosure would mount a massive, direct-to-consumer advertising campaign and host parties to drive in customers.

70.    Based on these representations, Virapel purchased a SculpSure for its offices for $165,750. But little of what Cynosure told Virapel proved to be true.

71.    Patients did not find the treatment painless or easily tolerable. Instead, patients found the procedure so painful and unnerving that the operator could not leave the room without

risking the patient falling out the treatment chair and sustaining injury. One patient even fainted from the treatment on account of the heat.

72.     Treatments did not produce the significant fat reduction in one treatment as promised either. And it was not until after Virapel purchased the device that Cynosure disclosed its "treat to complete" protocol.

73.     Cynosure similarly misrepresented its marketing plan. It did not engage in a large direct-to-consumer marketing campaign. In fact, instead of driving customers to Virapel, it placed competition *next door*—selling another unit 30 yards away on the opposite side of the parking lot.

74.     Ultimately, the areas that Cynosure stressed as the key features or selling points of the device turned out to be its pitfalls. Virapel has thus ceased treating patients with SculpSure, but its practice continues to suffer. The loan places considerable financial strain on the business. As a result, the practice has not been able to pay Dr. Miller for six months and has needed an infusion of cash from Dr. Miller's personal funds to stay afloat. The business has been forced to forego raises for its staff due to losses from SculpSure.

75.     Virapel has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 2.    Atlantic Plastic Surgery Center

76.     Atlantic Plastic Surgery Center operates under the supervision of Dr. Lawrence Gray in Portsmouth, New Hampshire, offering plastic surgery, skin care treatments, and cosmetic procedures.

77.     In October 2015, Dr. Gray attended the American Society of Plastic Surgeons (ASPS) meeting in Boston, Massachusetts, where Cynosure presented a lecture from Dr. Barry DiBernardo regarding SculpSure. The lecture stressed several key aspects of SculpSure,

comparing the device to its biggest competitor, Coolsculpting. First, Cynosure touted SculpSure as more effective than Coolsculpting, claiming SculpSure required only one treatment that would reduce 24% body fat in the treated area. Second, it claimed the procedure was painless, and thus tolerated better by patients than Coolsculpting. Finally, it claimed that SculpSure would provide a more significant return on investment than Coolsculpting because it was a short treatment and "hands free," utilizing less of the doctors' or staff's time.

78.    Based on these representations, Dr. Gray agreed to purchase a SculpSure at the ASPS meeting for $165,000.

79.    Yet Atlantic Plastic Surgery did not find Cynosure's representations to be true. Patients did not get the results SculpSure had touted, and had difficulty enduring the treatments due to the extreme heat. The practice dealt with numerous complaints, issued refunds to unsatisfied SculpSure patients, and re-treated many patients with other procedures.

80.    All told, Atlantic Plastic Surgery could not continue to recommend SculpSure to its patients and discontinued using the device. Yet SculpSure has already resulted in considerable damage to the business. The device failed to generate nearly enough revenue to cover its significant cost. And the practice has lost customers, dealt with customer complaints, and been forced to issued refunds or free treatments on account of the device.

81.    Atlantic Plastic Surgery has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**3.    Serenity Integrated**

82.    Serenity Integrated operates as a wellness spa and provides various aesthetic treatments to patients from its facilities in Fayetteville, North Carolina.  The practice is operated by Sandhya Thomas-Montilus, M.D.

83.     Dr. Thomas-Montilus first learned of SculpSure when a Cynosure representative, Jami Zimmerman, visited Serenity Integrated unannounced in May 2016.  Zimmerman claimed that SculpSure would require only one treatment to permanently eliminate approximately 25% of the fat in a patient's treated area. She described the device as "painless" and "FDA-approved." Zimmerman even claimed that, according to market research Cynosure conducted in the Fayetteville area, Serenity Integrated could charge $1,400 per treatment and would draw $35,000-to-$45,000 in monthly revenue from SculpSure treatments.

84.     Zimmerman later returned to Serenity Integrated with Brandon Nye from Cynosure, who repeated Zimmerman's claims. Nye promised personalized marketing support from a Cynosure representative throughout the process to drive sales.

85.     Based on these promises, Serenity Integrated decided to acquire SculpSure from Cynosure in late-May 2018 for $165,750.00.

86.     But Cynosure's promises immediately proved false. Shortly after Serenity Integrated purchased the device, Cynosure contradicted its claim of SculpSure as a "one-and-done" treatment, opining at least two treatments would be necessary. Further, initial experiences with the device refuted SculpSure's assurances of a "painless" or "gentle" treatment. Dr. Thomas-Montilus experienced significant pain from the treatment herself, while patients described it as a fire-like burning, more excruciating than the worst menstrual cramps, or even worse than labor pains. Some demanded refunds. Others scolded Serenity Integrated for selling them the procedure.

87.     Cynosure also failed to provide the marketing support it promised. Brandon Nye never returned any calls or requests for support. And Cynosure's dedicated support manager, Kathryn Samra, claimed it was not her job to help Serenity Integrated with marketing.

88.     Ultimately, the defects made it near-impossible to sell the treatment to patients, who balked at spending over $1,000 on multiple painful treatments with little promise of seeing results. And when Serenity Integrated sought advice from Jami Zimmerman as to how to sell the treatment given its shortcomings, Zimmerman responded: "lie, if you have to."

89.     Serenity Integrated could not lie to its patients though. And after months of attempting to make SculpSure work, the practice found itself in financial distress. Serenity Integrated could no longer afford to make the payments on their lease with the financing company, who repossessed the machine in early 2018. Serenity Integrated also lost patients, some of whom told others about their poor experience with SculpSure. And, with significant capital tied up in SculpSure, the practice could not pursue other opportunities to grow its business.

90.     Serenity Integrated has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**4.     Osafo Health Care**

91.     Osafo Health Care is an internal medicine practice located in Bolingbrook, Illinois. The practice is run by Seth Osafo, M.D., and Cynthia Osafo, its practice manager.

92.     In April 2016, Bradley Hohenstein of Cynosure arrived at Osafo Health Care with information regarding SculpSure. He explained that he had sought out the practice, despite its focus on internal medicine, because of its weight loss program. According to Hohenstein, the demand in Osafo Health Care's zip code had been so great on Cynosure's AMPS marketing site, that the company needed to find a provider to service the area.

93.     Hohenstein explained that SculpSure was a new piece of "fat burning" technology. He said that the treatment would take just 25 minutes, did not cause the patient any pain, and would permanently eliminate 24% of the body fat in the treatment area after just one

treatment. Hohenstein added that, six weeks after the treatment, patients would see "amazing" results.

94.     While Osafo Health Care met his claims with some skepticism, Hohenstein promised to take full responsibility if the machine did not work out. He claimed that he passionately stood by SculpSure and promised the company would take the machine back if the device didn't work—which it didn't.

95.     Every patient treated had difficulty enduring the procedure due to intense heat and pain. One patient had to be held down and reassured to complete the treatment. Another patient required a fan and cold water throughout. Each patient expressed dissatisfaction with the results. Osafo Health Care likewise did not receive the influx of patients through Cynosure's AMPS marketing site, as Hohenstein promised; the practice did not book a single patient through the website.

96.     On account of these issues, Osafo Health Care stopped offering SculpSure. And, despite Hohenstein's claim that the practice could return the machine if it did not work, Cynosure has refused to take back the machine.

97.     In addition to the emotional distress it has caused Osafo Health Care's staff, SculpSure remains a financial drain on the practice. Osafo Health Care has been unable to generate enough income from the general practice to cover the cost of SculpSure, and struggles to pay its overhead. Its credit has suffered and the company has been forced to hire legal counsel to deal with the creditor.

98.     Osafo Health Care has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

5.      **Sensual Aesthetics**

99.      Sensual Aesthetics is a cosmetic medical laser center located in New York, New York. The practice is run by Farhad Mohebban, M.D., and its manager, Fatemeh Tehrani.

100.     Sensual Aesthetics first learned of SculpSure from an email from Cynosure in late-July 2015, after the device received clearance from the FDA. In October 2015, Jack Matarazzo, a representative from the company arrived at Sensual Aesthetics' office in Midtown Manhattan. He described SculpSure as "revolutionary" because it would eliminate approximately 24% body fat in a single, "hands-free," 25-minute treatment without pain. Matarazzo told the practice it would have to act quickly, however, because the price was going to increase and there would soon be a nine-to-12 month waiting list.

101.     Sensual Aesthetics purchased the device in November 2015 for $183,265, financing the cost with monthly payments of approximately $3,988. But despite the considerable expense, the machine did not deliver any of Cynosure's promises.

102.     Patients complained of poor results and the pain associated with the treatment, some describing it as "torture," even on lower settings. Sensual Aesthetics performed other treatments for free to keep SculpSure patients happy. Eventually, Sensual Aesthetics had to stop offering SculpSure to its patients.

103.     Sensual Aesthetics continues to suffer financially from SculpSure. It spent thousands on marketing and media to promote the procedure. The practice must pay the nearly $4,000 monthly payment to avoid defaulting on the loan. It has been forced to reduce its staff. The practice has lost customers, and its reputation and credibility has suffered from unsuccessful treatments.

104.     Sensual Aesthetics has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 6. Laurene A. Grabill, D.M.D.

105.    Laurene Grabill, D.M.D., provides various dental and cosmetic treatments from her practice in West Chester, Pennsylvania.

106.    In late-May 2017, Cynosure representative Sean Betesh cold-called the offices of Dr. Grabill, and set up a meeting to discuss SculpSure. At that meeting, Betesh described SculpSure as a painless, 25-minute "lunchtime" procedure that would eliminate 24% of the body fat in the treated area. Betesh described the procedure as comparable to noninvasive liposuction.

107.    Betesh additionally promised that Cynosure would promote Dr. Grabill's practice as the only office with SculpSure in West Chester, Pennsylvania. Betesh likewise claimed that Cynosure's extensive marketing support and open houses' would generate substantial business; Betesh assured Grabill the first open house would generate $30,000 in sales alone.

108.    Based on these promises and representations, Dr. Grabill purchased a SculpSure and the chin-attachment for her office on June 22, 2017 for $191,000. But Dr. Grabill soon learned Cynosure's promises rang hollow.

109.    First, despite Cynosure representing the device as "painless," nearly all patients complained of excruciating pain from the procedure, with some developing nodules post-treatment. Moreover, patients did not achieve results with SculpSure. In fact, due to poor results and significant pain, most patients did not even bother to return for any additional sessions. Dr. Grabill often had to refund unhappy patients or provide free treatments at her expense.

110.    Cynosure also failed to meet even the most basic of its promises regarding marketing support. Dr. Grabill's practice was not the only office in West Chester with a SculpSure. Cynosure constantly changed the personnel assigned to Dr. Grabill's practice, leading to poor support and cancelled appointments. Even the open house that Betesh "guaranteed"

would generate $30,000 in revenue had to be cancelled because Cynosure failed to promote the event to consumers.

111.    Due to the device's failures, Dr. Grabill ceased treating patients with SculpSure. And were it not for Cynosure's misrepresentations regarding SculpSure, she would have never purchased it in the first place.

112.    Dr. Grabill's practice continues to incur damage from SculpSure. The treatment has not generated any revenue for months, but the practice must still make the monthly payments to avoid defaulting on the loan. Dr. Grabill also spent considerable money on advertising, which ultimately went to waste. Further, the financial strain has impacted Dr. Grabill's ability to grow her dental business, because so much money continues to be tied up in monthly payments for SculpSure.

113.    Dr. Grabill's practice has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**7.    Eternal Beauty Skin and Laser**

114.    Eternal Beauty Skin and Laser, now closed, was a medical cosmetic clinic that offered a variety of cosmetic, facial, and laser treatments from its offices in Cupertino, California. It was run by John A. Vink, the Chief Executive Officer, and Jennylyn Gleave.

115.    Eternal Beauty first learned of SculpSure in October 2015 from Cynosure representative Amanda Hogan. During their meeting, Hogan claimed SculpSure would reduce body fat in the treated area by 24% in a single, well-tolerated, 25-minute session. She also claimed the operator would not need to be present during the treatment.

116.    Hogan also claimed that she had only one unit to sell and that only one other clinic in San Francisco owned a SculpSure. Hogan represented that, if Eternal Beauty purchased the machine, it would be the only clinic in the area with the machine for at least six months.

Finally, Hogan claimed Cynosure would do a "marketing blitz" directly to consumers, driving patients to Eternal Beauty.

117.    Based on these representations, Eternal Beauty purchased a SculpSure for $183,000.

118.    SculpSure arrived in January 2016. However, before Eternal Beauty could put the product to use, it discovered that several clinics very close to Eternal Beauty already owned a SculpSure, rendering Cynosure's promise of territorial exclusivity untrue. And when Eternal Beauty started to implement the treatment, it discovered additional misrepresentations.

119.    First, it found that patients did not get the results marketed by Cynosure, especially in the single treatment advertised. Further, patient tolerability became a problem. Often, treatments had to be stopped because the patient would get too hot and uncomfortable— which also made it impossible for any nurse to leave a patient alone. And finally, Cynosure did not run the "marketing blitz" campaign promised; in fact, not a single patient came to Eternal Beauty as a result of Cynosure marketing.

120.    SculpSure drained resources from the practice. Its significant cost required at least a certain number of patients to break even. But the lack of territorial exclusivity and the non-existent marketing support from Cynosure meant Eternal Beauty had to spend extra money and effort to market the treatment to patients. And even when Eternal Beauty could find potential customers, they most often left unsatisfied; Eternal Beauty lost several customers and refunded others. Further, the money tied up in SculpSure meant the practice could not grow the business in other areas. Ultimately, the financial strain proved too much. Eternal Beauty was forced to close in November 2016.

121.    Eternal Beauty has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**8.    Cosmetic Dermatology Center**

122.    Cosmetic Dermatology Center operates in McLean, Virginia, under the supervision of Nicole Hayre, M.D. It has been in business for approximately 14 years, and offers various cosmetic, skin care, and body contouring treatments to its patients.

123.    In early 2016, Cosmetic Dermatology first learned of SculpSure after a visit from a Cynosure representative to its offices. Then, in March 2016, Dr. Hayre attended the American Academy of Dermatology meeting in Washington, D.C. At the meeting, she learned more about SculpSure from Dan Wilson of Cynosure.

124.    Wilson explained that the treatment would be painless. He also stressed the efficacy, claiming that one 25-minute treatment would be enough for patients to see a visible reduction in body fat of approximately 24% without them changing their lifestyle. He finally noted that the procedure was hands-free, so the operator need not stay in the room.

125.    Based on these representations, Cosmetic Dermatology purchased a SculpSure for $165,750.

126.    After delivery of the device, Cosmetic Dermatology aggressively marketed SculpSure to its client base. However, upon starting treatments, the practice learned that Cynosure had misrepresented the device. Treatments with SculpSure caused significant pain to patients. And multiple treatments did not produce results in patients—to say nothing of the "one-and-done" advertised.

127.    Cosmetic Dermatology assumed the machine must be a lemon and requested the device be replaced with a functioning model. But even after replacing the device, the problems persisted.

128.     Cosmetic Dermatology no longer offers SculpSure to patients, as the device has harmed its reputation and practice. Many patients complained about SculpSure, with some expressing a lack of interest in other procedures after their experience. Financially, the device has drained resources. The constant poor results required Cosmetic Dermatology to offer refunds, free retreatments, or other procedures at its own expense to appease unhappy patients. And now the practice must make costly payments on the device to avoid defaulting on the loan, despite an inability to recoup those costs.

129.     Cosmetic Dermatology has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**9.     Touch MedSpa**

130.     Touch MedSpa is a cosmetic medical practice located in North Myrtle Beach, South Carolina. It is run by Mendel Bell and focuses on laser treatments, skincare, injectables, and other cosmetic treatments.

131.     In January 2016, Jeff Willard of Cynosure approached Touch MedSpa to discuss SculpSure. During their meeting, Willard claimed that SculpSure was a painless treatment that lasted 25 minutes with a 25% reduction of fat in the treated area. He said that one treatment was all that was necessary, and that once the treatment had been initiated, the operator could leave the patient unattended.

132.     Based on these representations, Touch MedSpa agreed to purchase SculpSure for its practice in January 2016 for $125,000.

133.     But Touch MedSpa's staff immediately grew frustrated with the treatment. Patients complained of the pain and significant discomfort. And after waiting 12 weeks to see results, patients felt they had wasted their money, time, and effort.

134.    Touch MedSpa reached out to Cynosure, who responded it should treat the patients multiple times to improve results. But Touch MedSpa purchased SculpSure based on Cynosure's representation of it as a "one-time" treatment. And even still, Touch MedSpa still could not improve its experience with the machine.

135.    All told, SculpSure has harmed Touch MedSpa's business. The practice has been unable to generate enough revenue from SculpSure to cover the expenses incurred operating it. Touch MedSpa has seen its reputation damaged by the many unsuccessful SculpSure treatments, which have also resulted in refunds and free treatments to patients. Accordingly, Touch MedSpa no longer offers SculpSure to its patients.

136.    Touch MedSpa has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**10.    Dr. Joseph LaBricciosa**

137.    Joseph LaBricciosa, D.O. runs a family medicine practice in Broomall, Pennsylvania.

138.    In November 2016, Bob Iero, a representative from Cynosure, visited Dr. LaBricciosa's offices to sell SculpSure. Iero told Dr. LaBricciosa that SculpSure was a single, 25-minute, nonsurgical treatment that reduced fat by 24%. He claimed the procedure was easily tolerated by patients and virtually painless. Iero added that the demand for the procedure meant Dr. LaBricciosa could command $1600 per treatment. Iero also promised that Cynosure would do "all of the marketing." When Dr. LaBricciosa expressed concerns about not getting enough patients to cover the monthly payments, Iero responded, in that case, Cynosure will have "failed" his practice.

139.    Based on these representations, Dr. LaBricciosa purchased a SculpSure for approximately $200,000 in December 2016.

140.    But Cynosure's so-called marketing support did little to produce any patients to Dr. LaBricciosa's practice. And those patients he did treat did not see success. Patients complained of the pain, with many being unable to tolerate the excessive burning and some refusing to return for a second treatment. Patients also saw only negligible results, if any. And attempting to use SculpSure's higher setting of 1.4 W/cm$^2$ to try and improve results only exacerbated the issues with patient intolerability.

141.    Combined, these issues meant Dr. LaBricciosa's concern about being unable to generate enough revenue to cover the cost of the device had come to fruition. Cynosure, however, refused to own up to that failure. When Dr. LaBricciosa explained his situation to Michael Russo of Cynosure, Russo responded that any problems with the treatment were the fault of Dr. LaBricciosa, not Cynosure. And so Cynosure declined to accept a return of the device or help Dr. LaBricciosa sell it.

142.    Meanwhile, Dr. LaBricciosa's practice continues to suffer damages. It has lost money and pays more than $5,300 monthly on its SculpSure loans, despite being unable to recoup the cost. And the considerable financial strain prevents Dr. LaBricciosa from pursuing other opportunities to grow the business. With all of its problems, SculpSure now goes unused by Dr. LaBricciosa.

143.    Dr. LaBricciosa's practice has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**11.    Rochester Family Care**

144.    Rochester Family Care is an internal medicine practice in Rochester Hills, Michigan. It is operated by Helen Wei, M.D.

145.    Dr. Wei originally learned of SculpSure from a magazine advertisement in July 2016. After contacting Cynosure, she met with Pace McCormick. McCormick touted the efficacy

of the machine, referring to SculpSure as just as effective as its competitors, while being quicker and "much more tolerable" than its competitor, Coolsculpting. McCormick also promised that if the machine did not work out for Rochester Family Care, he would help the practice sell or dispose of the device, but that it "very rarely happens."

146.    Based on these representations, Rochester Family Care purchased a SculpSure for $165,750.

147.    The practice first learned that Cynosure's representations regarding pain in no way aligned with the realities of the treatment. Dr. Wei and her staff experienced significant discomfort during training sessions, and subsequent patients suffered the same. Dr. Wei attempted to remedy the issue in creative ways—playing relaxing music, using a fan to cool the patient, coaching patients through the discomfort, using 1000mg of Tylenol—but little worked. No patient returned for a second treatment. The results were poor.

148.    Dr. Wei tried to work with Cynosure to solve the issues, but it proved fruitless. Cynosure told her the machine did not have any defects and only offered another training session as a potential solution.

149.    Rochester Family Care performed its last SculpSure treatment in June 2017. The patient, naturally, could not tolerate the procedure.

150.    The practice has since retired the device, but Rochester Family Care continues to suffer damages due to SculpSure. It has refunded customers and lost business. And with the monthly payments still due, the device remains a constant drain on finances. Cynosure has refused to take back the machine, nor has it followed through with its promise to help Rochester Family Care sell the device.

151.    Rochester Family Care has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**12.    Lewis Wyatt, Jr., M.D.**

152.    Dr. Lewis Wyatt, Jr. has been practicing in obstetrics and gynecology for 45 years. He currently has an office in Los Angeles, California.

153.    On July 13, 2016, representatives from Cynosure arrived at Dr. Wyatt's offices to pitch SculpSure to his practice. At the presentation, the representatives claimed that SculpSure would be a one-time treatment to remove 25% of the fat in the treated area in 25-minutes. They told him it would be painless, and while pain might occur with competing devices like Coolsculpting, it would not with SculpSure. Further, the representatives claimed the device was so simple and tolerable that a staff member need not even be in attendance after the treatment has been started.

154.    Based on these representations, Dr. Wyatt purchased SculpSure for $180,750. The representations proved untrue with the first treatment.

155.    All patients described pain, discomfort, or the need for some form of medication. Almost half the patients stopped the treatment altogether. Several patients called back to claim it did not work. Every patient was either given a full or partial refund.

156.    Cynosure deflected Dr. Wyatt's complaints as unusual. Cynosure assured him no other practices had experienced what he experienced, and offered no solution. Cynosure refused to take the machine back. But Dr. Wyatt could not keep jeopardizing his practice by treating patients with SculpSure after all of the initial treatments had been so negative. He eventually discontinued using the device.

157.    Dr. Wyatt has suffered significant damages due to SculpSure. He has lost patients, who never returned after complaining about SculpSure. His reputation has suffered from

recommending a procedure that did not work. And he has lost money due to the sizeable cost of the device. After attempting to work out a deal with Cynosure and the financing company, Dr. Wyatt could no longer afford to make payments on SculpSure and his machine was repossessed.

158.    Dr. Wyatt's practice has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 13.    Jadyn Wealth Properties, LLC (Oasis Body Sculpting)

159.    Jadyn Wealth Properties is a Texas limited liability company owned by Kelly Eberly. It purchased a SculpSure, renting it to another of Eberly's businesses, Oasis Body Sculpting & Spa.

160.    Eberly first learned of SculpSure from multiple Cynosure representatives in mid-2016. The representatives claimed that SculpSure was the "hottest" machine on the market because it had a market-leading fat reduction of 24% in just one 25-minute treatment, while being painless and simple to operate. The representatives also promised a direct-to-consumer "media blitz," in the form of television commercials, events, and internet ads that would drive customers to Oasis Body Sculpting.

161.    Based on these representations, Eberly purchased a SculpSure for Oasis Body Sculpting via Jadyn Wealth Properties for $159,000 in August 2016.

162.    The sales representatives' representations, however, proved untrue. Almost half of Oasis Body Sculpting's patients wanted their money back because of poor results. Many experienced significant pain, with some even being unable to complete the treatment.

163.    Because of the failures of SculpSure, Oasis Body Sculpting could not pay back Jadyn Wealth Properties the money owed from the purchase of the device. And ultimately, with Oasis Body Sculpting unable to generate revenue from SculpSure, Eberly had to sell the spa business entirely. The SculpSure remains in storage, going unused.

164. Jadyn Wealth Properties has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**14. Sculpt Virginia Beach**

165. Sculpt Virginia Beach is a medical spa located in Virginia Beach, Virginia. It is operated by Lani Warren, M.D.

166. Dr. Warren learned of SculpSure from Cynosure representative, Dan Wilson, while employed at another medical practice in Chesapeake, Virginia.

167. Then, in the fall of 2016, Dr. Warren attended a trade show at the Mayflower Hotel in Washington, D.C., where Dr. R. Stephen Mullholland presented on SculpSure.

168. At the show, Cynosure claimed that SculpSure was a hands-free treatment that would achieve 20-24% fat reduction after just one 25-minute treatment. It touted the procedure as effectively painless, and further boasted that the device had been so successful, practices had been paying off their loans on the device in less than a year.

169. Further, Cynosure made aggressive claims about its direct-to-consumer marketing strategy, telling potential purchasers that it would buy ads on local billboards, public transit, and TV and radio stations to drive consumer to their practices.

170. Based on these representations, Sculpt Virginia Beach purchased a SculpSure for $187,750 in September 2016.

171. Dr. Warren soon realized that Cynosure had misrepresented its claims about SculpSure. The treatment proved to be painful for its patients, and failed to produce the results in fat reduction as advertised. Nor did Cynosure engage in the marketing campaign it promised in the Virginia Beach area.

172. The failures of the device have placed substantial pressure on Sculpt Virginia Beach's business. The practice received poor reviews online and negative feedback from

patients. It had to offer refunds or provide free treatments for unsatisfied patients. And given the financial burden associated with SculpSure, Dr. Warren had to cut back on marketing for the practice and lay off staff members. With patients uninterested in the procedure and Sculpt Virginia Beach unwilling to further jeopardize the practice, the SculpSure now goes unused.

173.    Sculpt Virginia Beach has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 15.    Helendale Dermatology & Medical Spa

174.    Helendale Dermatology & Medical Spa operates in Rochester, New York, providing various skin care and cosmetic treatments. Elizabeth A. Arthur, M.D. owns and operates the practice.

175.    Dr. Arthur first learned of SculpSure from a Cynosure sales representative, Gary LaPerle, in early 2016. In selling SculpSure, LaPerle made serveral representations about the device. First, he claimed it would be a painless treatment, such that the technician or nurse operating the machine need not even stay in the room for the procedure. Second, he claimed just one 25-minute treatment would be needed per patient, and that one procedure achieved 24% body fat reduction. Dr. Arthur inquired about demoing a unit to try it, but Cynosure would not allow them to test it.

176.    Nevertheless, given the representations regarding SculpSure's efficacy, tolerability, and ease of use, Helendale Dermatology agreed to purchase a SculpSure for $180,750 in March 2016.

177.    But not long after Helendale Dermatology began treating patients did the staff lose confidence in the procedure. Patients complained early on about the pain associated with the treatment and the poor results. The staff had to remain in the room to constantly administer cool

blasts and calm patients. Dr. Arthur underwent the treatment herself and could not tolerate the procedure due to the excessive heat.

178.    Cynosure responded to Helendale Dermatology's complaints by noting that the practice should now be treating patients multiple times. But even after two treatments, patients still saw no results.

179.    SculpSure proved to be an enormous failure for the practice, harming both its finances and reputation. Helendale Dermatology had to issue many refunds and free treatments to unsatisfied patients. It spent over $20,000 in advertising SculpSure locally, but still could not generate interest in the procedure. And ultimately, the staff became uncomfortable selling a treatment that they believed would only make the patient unhappy. Unable to sell the device, the SculpSure goes unused in Helendale Dermatology's offices.

180.    Helendale Dermatology has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

**16.    Infinity MedSpa+Wellness**

181.    Infinity MedSpa+Wellness, PLLC is a medical spa in Charlotte, North Carolina. JoBrent Austin-Diehl owns and manages the practice.

182.    In January 2016, Jeff Willard and other representatives of Cynosure visited Austin-Diehl's residence to meet with Austin-Diehl and pitch SculpSure, as well as other Cynosure devices. In that meeting, Willard described SculpSure as "proven" to reduce fat by 24% in patients. He represented the procedure as "painless," "one-and-done," and with "no downtime or side-effects."

183.    Later in Spring 2016, Austin-Diehl attended an Aesthetics Masters Course presented by Cynosure in Charlotte, North Carolina. There, Cynosure repeated the claims from Austin-Diehl's January meeting with Willard and the other representatives.

184.    Based on these representations, Infinity MedSpa+Wellness purchased a SculpSure for $161,679.38 in April 2016.

185.    After treating patients with device, however, Infinity MedSpa+Wellness found Cynosure's representations regarding SculpSure to be untrue. The staff became disillusioned with the procedure, after treating patients and not seeing any results. Patients consistently complained of pain and excess heat, making the treatment difficult to endure. The practice had to offer free treatments to keep customers happy after several patients asked for money back. The practice lost customers.

186.    Infinity MedSpa+Wellness attempted to work with Cynosure to find a solution. But all Cynosure offered was "additional training." With no solution to the problems created by SculpSure, Infinity MedSpa+Wellness stopped offering the procedure to patients. It could not risk further jeopardizing the reputation of the practice. The practice still owes monthly payments on the device, creating financial strain.

187.    Infinity MedSpa+Wellness has suffered actual damages and losses arising out of Defendant's misrepresentations and its purchase of SculpSure.

## V.    CLAIMS ALLEGED

### COUNT I
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### (G.L. CHAPTER 93A)

188.    Plaintiffs hereby incorporate paragraphs 1 through 187 as if fully set forth herein.

189.    This cause of action is brought by Plaintiffs pursuant to the Massachusetts Consumer Protection Act, G.L. Chapter 93A §§ 2, 11 *et. seq*..  Section 2 of the Massachusetts Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

190.    Plaintiffs and Defendant are "persons" under the Massachusetts Consumer Protection Act pursuant to G.L. Chapter 93A § 1(a).

191.    SculpSure is tangible property involved in "trade" and "commerce" subject to the Massachusetts Consumer Protection Act pursuant to G.L. Chapter 93A § 1(b).

192.    At all relevant times, Defendant violated and continues to violate the Massachusetts Consumer Protection Act in its transactions regarding SculpSure. Specifically, Defendant deceived Plaintiffs by misrepresenting certain qualities and attributes of the SculpSure procedure. Defendant misrepresented, *inter alia,* to Plaintiffs that:

(a) SculpSure requires only one 25-minute treatment to achieve 24% fat loss, when in fact it requires multiple treatments and still is likely to be ineffective;

(b) the treatment was virtually painless and easily tolerable without any pain medication or anesthesia, when in fact it is very painful and patients routinely could not tolerate the procedure; and

(c) SculpSure could be performed "hands free" without a physician or trained staff member present during the entire procedure, when in fact one was required at all times to monitor energy levels.

193.    Defendant's deception has caused substantial injury to Plaintiffs. Plaintiffs cannot recommend a procedure that involves several painful treatments and still does not yield any meaningful result in the patient. And so they have spent hundreds of thousands of dollars on a machine that is ultimately inappropriate for their practice and does not work in a commercially viable way. The machine effectively goes unused, not only denying Plaintiffs the ability to make a profit, but also the opportunity to recoup the sizeable costs already incurred. Plaintiffs have lost money and had their businesses placed under considerable financial strain.

194.    Accordingly, as a direct and proximate result of Defendant's deceptive acts and practices, Plaintiffs did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

195.    Plaintiffs hereby incorporate paragraphs 1 through 194 as if fully set forth herein. Under Massachusetts law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."[36] To be merchantable, goods must at least be "fit for the ordinary purposes for which such goods are used."[37]

196.    Defendant is a merchant under Massachusetts law who specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Defendant designed, manufactured, and marketed SculpSure, a noninvasive body-contouring device from its offices in Massachusetts.

197.    Beginning in late 2015, Defendant marketed and sold the SculpSure device all over the country. In selling the device, Defendant specifically targeted cosmetic and aesthetic medical practices, including small medical offices and med spas like Plaintiffs. In selling to Plaintiffs, Defendant represented that SculpSure would be appropriate for their practices, namely because it: (a) involves only one, simple 25-minute treatment to achieve 24% fat loss; (b) is virtually painless and easily tolerated by the patient without pain medication or anesthesia; and (c) could be performed "hands free" without a physician and/or trained staff member present during the entire procedure.

---

[36] Mass. Gen. Laws Ann. ch. 106, § 2-314(1).

[37] Mass. Gen. Laws Ann. ch. 106, § 2-314(2)(b).

198.    At no time, however, has SculpSure actually been suitable for the ordinary purposes for which it is intended. Even when Plaintiffs use the machine as envisioned by Defendant's marketing and as directed by Defendant, SculpSure cannot successfully be performed as a one-time treatment, frequently causes significant pain in the patient, and requires hands-on assistance from a physician or trained staff member to administer the treatment. It is thus not fit for use in medical spas, physician offices, or as otherwise marketed by Defendant.

199.    As a consequence, Plaintiffs have spent hundreds of thousands of dollars on a machine that is not suitable for their practices. Plaintiffs have lost money and had their businesses placed under considerable financial strain. Accordingly, Plaintiffs did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## COUNT III
## UNJUST ENRICHMENT

200.    Plaintiffs hereby incorporate paragraphs 1 through 199 as if fully set forth herein.

201.    Plaintiffs purchased or leased SculpSure machines from Defendant. In turn, Defendant has received significant revenue from Plaintiffs for their purchases or leases of the machine, as well as their purchase of PAC Keys.

202.    Defendant has frequently touted the success of its sales of SculpSure, directly attributing the company's record revenues to sales of the machine.[38] Likewise, Hologic, Inc., who acquired Defendant for approximately $1.44 billion in early 2017, consistently singled out SculpSure when discussing reasons for the massive acquisition of the company.[39]

---

[38] CYNO – Q2 2016 Cynosure Inc. Earnings Call, at 3 (Jul. 26, 2016).

[39] HOLX – Hologic Inc to Acquire Cynosure Inc. Conference Call, at 4, 6-7, 9 (2017)

203.     Defendant's enormous financial gains, however, come at the expense of Plaintiffs. Plaintiffs purchased SculpSure because Defendant marketed the device as not only suitable for their practice, but as premier technology. Defendant touted certain attributes, namely that SculpSure: (a) involves only one, simple 25-minute treatment to achieve 24% fat loss; (b) is virtually painless and easily tolerated by the patient without pain medication or anesthesia; and (c) could be performed "hands free" without a physician and/or trained staff member present during the entire procedure. The company also made bold claims about its direct-to-consumer marketing strategy.

204.     But in practice SculpSure has shown to possess none of the characteristics represented by Cynosure. And the company has not followed through with its promised "marketing blitz."

205.     The procedure cannot successfully achieve results as a one-time treatment. SculpSure causes significant pain in countless patients. And requires hands-on assistance from a physician or trained staff member to administer the treatment.  Plaintiffs cannot recommend a procedure that involves several painful treatments and does not yield any meaningful results, the machines effectively go unused.

206.     Accordingly, it would be inequitable and unjust for Defendant to retain its ill-gotten fortune, which should be disgorged.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue an order:

a) Finding that Cynosure breached the implied warranty of merchantability, violated the Massachusetts Consumer Protection Law, and was unjustly enriched;

b) Awarding Plaintiffs all appropriate damages, including trebling;

c) Awarding Plaintiffs restitution in the form of complete disgorgement of all revenue derived from sales or leasing of the SculpSure product and PAC keys;

d)  Awarding Plaintiffs their reasonable litigation expenses and attorneys' fees;

e)  Entering such other injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs; and

f)  Awarding such other and further relief as equity and justice may require.

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: June 18, 2018                    Respectfully Submitted,

                                        HAGENS BERMAN SOBOL SHAPIRO LLP


                                        **By: /s/ Lauren Guth Barnes**
                                        Lauren Guth Barnes (BBO# 663819)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        55 Cambridge Parkway, Suite 301
                                        Cambridge, MA 02142
                                        Telephone: (617) 482-3700
                                        Facsimile: (617) 482-3003
                                        E-mail: lauren@hbsslaw.com

                                        Elizabeth A. Fegan
                                        Mark T. Vazquez
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        455 Cityfront Plaza Drive, Suite 2410
                                        Chicago, IL 60611
                                        Telephone: (708) 628-4949
                                        Facsimile: (708) 628-4950
                                        E-mail: beth@hbsslaw.com
                                        E-mail: markv@hbsslaw.com

                                        Steve W. Berman
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1918 Eighth Avenue, Suite 3300
                                        Seattle, WA 98101
                                        Telephone:  (206) 623-7292
                                        Facsimile:  (206) 623-0594
                                        E-mail: steve@hbsslaw.com

                                        David Freydin
                                        Timothy A. Scott
                                        FREYDIN LAW FIRM LLP
                                        8707 Skokie Blvd # 305
                                        Skokie, IL 60077
                                        Telephone: (847) 972-6157

                                        *Attorneys for Plaintiffs*